IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:26-cv-104

| | |
|---|---|
| L.P. and C.P.,<br><br>        Plaintiffs,<br><br>   v.<br><br>NORTH CAROLINA DENTAL SOCIETY;<br>NORTH CAROLINA SERVICES FOR<br>DENTISTRY, INC.; INTERACTIVE<br>MEDICAL SYSTEMS CORPORATION;<br>AND NORTH CAROLINA DENTAL<br>SOCIETY HEALTHCARE PLAN,<br><br>        Defendants. | |

## **COMPLAINT**

Plaintiffs L.P. and C.P., by and through undersigned counsel, hereby complain against

Defendants, alleging in the totality and alternatively as follows:

## **INTRODUCTION**

Plaintiff L.P. was enrolled in a health plan subject to ERISA and enrolled his child, C.P.

as a plan beneficiary. C.P. received more than nine months of medical treatment at Crossroads

Academy ("Crossroads"). Defendants denied payment for any of the treatment, requiring

Plaintiffs to incur more than $144,000 in out-of-pocket expenses. The grounds for Defendants'

denials were Defendants' claim that Crossroads did not meet the Defendants' criteria for a

"Residential Treatment Facility." This litigation thus centers around the narrow issue of whether

the grounds for the denials were valid.

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiffs are, and were at all times relevant hereto, residents of Asheville, North Carolina.

2.      L.P. is C.P.'s parent.

3.      L.P. is eligible to participate in a health plan as an eligible employee of an employer who was a member of Defendant North Carolina Dental Society.

4.      Specifically, L.P. enrolled as a participant in the Defendant North Carolina Dental Society Healthcare Plan, the health benefit plan established by Defendant North Carolina Dental Society to provided health benefits for participants (the "Plan").

5.      C.P. is and was L.P.'s dependent child at all times relevant hereto.

6.      C.P. was at all times relevant hereto, enrolled by L.P. as a beneficiary under the Plan.

7.      The Plan is a self-funded medical plan, and the North Carolina Dental Society is the Plan's sponsor.

8.      Defendant North Carolina Services for Dentistry, Inc. is the "Plan Supervisor," and is responsible for supervising the operation of the Plan.

9.      Defendant Interactive Medical Systems Corporation ("IMS"), is the Plan's "Claims Administrator" and is responsible for processing claims for the Plan.

10.     The Plan is a welfare benefits plan under 29 U.S.C. § 1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA").

11.     The remedies Plaintiffs seek under ERISA and the Plan are for benefits due under the terms of the Plan and pursuant to 29 U.S.C. § 1132(a)(1)(B); and, in the alternative, for appropriate equitable relief under 29 U.S.C. § 1132(a)(3) based on Defendants' violation of the

Mental Health Parity and Addiction Equity Act of 2008 (the "MHPAEA"); as well as an award of pre-judgment interest; and an award of fees and costs pursuant to 29 U.S.C. § 1132(g).

12. This Court has jurisdiction over this case under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.

13. Venue is appropriate under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(c) based on ERISA's provisions regarding nationwide service of process and venue and the location of the Plan.

## FACTUAL ALLEGATIONS[1]

*Allegations regarding the Plan*

14. The North Carolina Dental Society issued a booklet titled North Carolina Dental Society Healthcare Plan, Plan Summary, Effective January 1, 2024 (the "Benefit Booklet").

15. Upon information and belief, Plaintiffs allege that the Benefit Booklet constitutes the official summary plan description for the Plan.

16. In general, the Plan's will pay "Covered Charges," including "Charges for treatment of mental infirmities, nervous disorders, alcoholism or chemical dependency."[2]

17. The Plan provides coverage for Mental Illness as follows:

This Plan will pay benefits for Mental Illness treatments as described in this section. Such benefits are subject to the appropriate Coinsurance requirements and other limitations set forth in the Summary Schedule of Benefits. The Plan will only pay the necessary, Reasonable and Customary expenses for Mental Illness treatments ordered by a Physician.

• Inpatient Treatment: The Plan will pay expenses on the same basis as any other Illness. Benefits are subject to the appropriate Coinsurance requirements and other limitations set forth in the Summary Schedule of Benefits. The patient

---

[1] Unless otherwise noted, the information supporting these allegations is contained within the Administrative Record. The Administrative Record is incorporated herein by reference.
[2] Benefit Booklet at 54.

3

must be confined to a Hospital, a properly licensed psychiatric institution, or a Residential Treatment Facility.[3]

18. The Plan also provides coverage for alcoholism and chemical dependency:

This Plan will pay benefits for the treatment of substance abuse as described in this section. Such benefits are subject to the appropriate Coinsurance requirements and other limitations set forth in the Summary Schedule of Benefits. The Plan will only pay the necessary, Reasonable and Customary expenses for the treatment of substance abuse ordered by a Physician. "Substance abuse" includes alcoholism and chemical dependency.

- Inpatient Treatment: The Plan will pay expenses on the same basis as any other Illness. Benefits are subject to the appropriate Coinsurance requirements and other limitations set forth in the Summary Schedule of Benefits. The patient must be confined to a Hospital, a properly licensed psychiatric institution, or a Residential Treatment Facility.[4]

19. The Plan defines "Mental Illness" as follows: "Mental Illnesses are diagnosed and defined in the Diagnostic and Statistical Manual of Mental Disorders, DSM-IV, or a subsequent edition published by the American Psychiatric Association."[5]

20. As more fully described below, prior to admission to Crossroads, C.P. was diagnosed with mental illnesses as defined in the DSM-V, and was treated for these illnesses at Crossroads.

21. The Plan defines the term "Reasonable and Customary" as follows:

The term "Reasonable and Customary" shall mean the usual charge made by the person, group or other entity rendering or furnishing the services, treatment or supplies. In no event shall it mean a charge in excess of the general level of charges made by others rendering or furnishing such services, treatment or supplies, within the area in which the charge is incurred, for Illness or Injury comparable in severity and nature to the Illness or Injury being treated. For purposes hereof, "area," as it would apply to any particular services, treatment or supplies, means a county or such greater area as is necessary to obtain a

---

[3] Benefit Booklet at 42.
[4] Benefit Booklet at 42.
[5] Benefit Booklet at 67.

4

representative cross section of persons, groups or other entities rendering or furnishing such services, treatment or supplies.[6]

22.     At no time have any of the defendants asserted that any of the charges for services Crossroads provided to C.P. were not reasonable and customary.

23.     The Plan contains the following broad definition of the term "Physician:"

The term "Physician" means a legally licensed medical or dental doctor or surgeon, or other licensed medical practitioner to the extent such practitioner is providing services within the scope of his or her license and practice. A "licensed medical practitioner" includes a duly licensed optometrist, a duly licensed podiatrist, a duly licensed dentist, a duly licensed chiropractor, a duly licensed occupational therapist, a duly licensed clinical social worker, a duly certified substance abuse professional, a duly licensed professional counselor, a duly licensed psychologist, a duly licensed pharmacist, a duly certified fee-based practicing pastoral counselor, a duly licensed Physician assistant, a duly licensed marriage and family therapist, or an advance practice registered nurse. A participant or beneficiary of the Plan may choose his or her Physician subject to the utilization review, pre-certification, and In-Network requirements of the Plan. A Physician shall not include the covered person or any close relative of the covered person.[7]

24.     As more fully described below, the treatment for mental illness and alcoholism and chemical dependency that C.P. received at Crossroads was ordered by a "Physician" as that term is defined in the Plan.

25.     The Plan provides benefits for treatment for mental illness and alcohol and chemical dependency that is provided at a "Residential Treatment Facility."

The term "Residential Treatment Facility" means a freestanding institution or facility that meets all of the following conditions:
• It is engaged primarily in providing diagnostic and therapeutic services and facilities for treatment of mental disorders and/or substance abuse on an Inpatient basis at the patient's expense;
• It maintains permanent and full-time facilities for bed care and full-time confinement of at least 15 residential patients;

---

[6] Benefit Booklet at 69.
[7] Benefit Booklet at 68.

- Treatment is provided for compensation by or under the supervision of Physicians with continuous twenty-four (24) hour nursing services by registered nurses;
- It has a full-time psychiatrist or psychologist on staff;
- It is constituted, licensed, and operated in accordance with the laws of jurisdiction in which it is located that pertain to residential treatment of mental disorders and/or substance abuse;
- It is not, other than incidentally, a place for rest, a place for the aged, or a nursing home.[8]

26.     As more fully described below, Crossroads meets the Plan's definition of a Residential Treatment Facility.

27.     According to the Plan, "[t]he term 'Alcoholic Rehabilitation Facility' means a duly licensed institution which is primarily engaged in providing rehabilitative services for alcoholism and/or drug addition."[9]

28.     As more fully described below, Crossroads falls under the Plan's definition of an Alcoholic Rehabilitation Facility because it is duly licensed by the state of Utah and is primarily engaged in rehabilitative services for alcoholism and/or drug addiction.

29.     According to the Plan's Summary Schedule of Benefits, the Plan provides benefits for Mental Health and Chemical Dependency (other than Standard Preventative Care) for Out-of-Network Inpatient/Outpatient care at "50%, subject to the Deductible."[10]

30.     The Plan includes a definition of "Medically Necessary."

The term "Medically Necessary" means those covered services or supplies that are:
- Provided for the diagnosis, treatment, cure, or relief of a health condition, Illness, Injury or disease; and, except as allowed under N.C.G.S. 58-3-255, not for Experimental, Investigational, or cosmetic purposes;
- Necessary for and appropriate to the diagnosis, treatment, cure, or relief of a health condition, Illness, Injury, disease or its symptoms;

---

[8] Benefit Booklet at 69-70.
[9] Benefit Booklet at 64.
[10] Benefit Booklet at 11-12.

- Within generally accepted standards of medical care in the community; and
- Not solely for the convenience of the covered person, the covered person's family or the provider.

The Plan may compare the cost-effectiveness of alternative services or supplies when determining which among several medically necessary services or supplies will be covered.[11]

31.     As more fully described below, the medical services that C.P. received at Crossroads were "Medically Necessary" as they were provided for the diagnosis, treatment, cure or relief of a health condition, illness or disease and were not for experimental, investigational or cosmetic purposes; the services were necessary for and appropriate to the diagnosis, treatment, cure or relief of a health condition, illness, disease or its symptoms; the services were provided within the generally accepted standards of medical care in the community; and the services were not solely for the convenience of C.P., C.P.'s family or the provider.

*Background of C.P.'s medical issues and treatment*

32.     Prior to admission to Crossroads, C.P. had an extensive history of depression, anxiety and substance abuse.

33.     C.P. began experimenting with alcohol in the eighth grade.

34.     In the ninth grade, C.P. began vaping THC and drinking consistently, especially at parties.

35.     In the tenth grade, C.P. started using ketamine, LSD, and morphine pills in combination with vaping and alcohol.

36.     In an effort to get help for C.P.'s worsening depression, anxiety and substance use, C.P.'s parents enrolled C.P. in a three-month outdoor behavioral health program called Trails Carolina, where C.P. made some small progress.

---

[11] Benefit Booklet at 67.

37. After completing the Trails Carolina program, C.P. went to another program for continued treatment, but this program was not a good fit and C.P. sought out harder drugs including cocaine, mushrooms and Xanax to self-treat C.P.'s worsening depressing and anxiety.

38. A psychological evaluation performed in March 2023, diagnosed C.P. with attention-deficit/hyperactivity disorder, combined presentation, severe (F90.2); posttraumatic stress disorder (F43.10); generalized anxiety disorder (F41.1); cannabis use disorder, moderate (F12.20); other hallucinogen use disorder, moderate (F16.20); and opioid use disorder, moderate (F11.20) under the criteria described in the DSM-5.

39. In 2024, C.P. overdosed on drugs and expressed suicidal ideation with a plan.

40. C.P. was taken to the emergency department, and from there was admitted to Mission Hospitals Adolescent Psychiatric Center where C.P. spent the following week.

41. A licensed clinical social worker evaluated C.P. and determined that C.P. met criteria for admission to a residential level of care because C.P.'s recent overdose and associated suicide ideation placed C.P. at high risk for self-harm, and ongoing misuse of addictive and life-threatening substances combined with C.P.'s careless and impulsive nature put C.P. at extreme risk for serious and life-threatening consequences.

42. Additionally, C.P. had a long history of multiple treatment modalities, including wilderness programs and short-term residential treatment, that had failed to manage C.P.'s mental health and substance use disorders.

43. C.P. received treatment for C.P.'s mental health and substance abuse disorders at Crossroads from August 28, 2024 through June 3, 2025. C.P. was a minor upon admission to Crossroads, turning 18 during that treatment time period.

44. Crossroads is a facility located in Ogden, Utah, that provides diagnostic and therapeutic services for treatment of mental health disorders and substance abuse disorders.

45. Crossroads is a permanent and full-time facility with bed care and full-time confinement for residential patients.

46. Crossroads has continuous twenty-four (24) hour nursing services by registered nurses with nursing services on-site during day shifts and on call 24/7.

47. Crossroads has a full-time psychiatrist or psychologist on staff.

48. Crossroads is fully licensed and operated in accordance with the laws of the State of Utah that pertain to residential treatment of mental disorders and substance abuse disorders.

49. C.P. benefitted from the intensive mental health treatment received at Crossroads and had improvements in each diagnosed condition from the services received at Crossroads.

50. Crossroads charged no less than $144,481 for the services it provided to C.P., which charges were submitted to IMR.

51. IMR denied all of Crossroads' charges for the services it provided to C.P.

52. In multiple Explanation of Benefits (EOB), IMS wrote that it was denying all of Crossroads' claims for the following reasons:

| 049 | THESE SERVICES WERE RENDERED BY A NON-PPO PROVIDER. |
| 760 | MEDICAL NECESSITY AS DEFINED IN YOUR PLAN SUMMARY BOOKLET HAS NOT BEEN ESTABLISHED, THEREFORE EXPENSE(S) ARE NOT ELIGIBLE FOR BENEFIT CONSIDERATION |
| HOS | THIS PROVIDER DOES NOT MEET THE PLAN'S DEFINITION OF COVERED HOSPITAL AND/OR FACILITY, THEREFORE EXPENSES HAVE BEEN DENIED. |

53. In a letter dated February 25, 2025, L.P. requested a Level One Member Appeal review of IMS's benefit denials of the claims submitted by Crossroads.

54. In the appeal, among other things, L.P. cited a denial letter that IMS sent to Crossroads dated 9/12/24, that stated that Crossroads does not appear to meet the Plan's definition of a Residential Treatment Facility and provided the complete definition of that term.

55. In the appeal, L.P. argued that Crossroads did in fact meet the Plan's definition of a Residential Treatment Facility and described how Crossroads satisfied each condition that the Plan required of a Residential Treatment Facility.

56. In the appeal, L.P. continued by noting that the Plan explicitly provides coverage for Mental Illness treatment and the treatment of alcoholism and chemical dependency, including inpatient treatment, and cited page 42 of the Benefit Booklet.

57. In the appeal, L.P. quoted the Benefit Booklet to show that the Plan provides benefits for Mental Health Coverage provided by In-Network and Out-of-Network providers.

58. In the appeal, L.P. noted that the Plan is subject to ERISA, and as such, IMS was obligated to provide Plaintiffs with certain rights when reviewing the appeal. As such, L.P.:

    a. Noted that ERISA obligated IMS to consider all information submitted by Plaintiffs relating to the claim when reviewing the appeal;

    b. Requested IMS assign a medical or vocational expert who is board certified in adolescent psychiatry and has experience treating adolescents with major depressive disorder, alcohol use disorder, cannabis use disorder, opioid use disorder, and other high risk behaviors in an intermediate residential setting;

    c. Requested a response that was clear, specifically stated the reasons for the determination, references the plan language on which the decision was based, and explained what other information Plaintiffs could provide in order to perfect the claims;

d. Requested a physical copy of all documentation used for the initial determination and level one appeal determination, as well as the reviewer's name, credentials and experience.

59. In the appeal, L.P. expressed a concern that IMS may be applying treatment limitations of the kind prohibited by the MHPAEA, and requested IMS conduct a comparative parity analysis to determine whether or not the Plan is truly being administered in compliance with the MHPAEA, and provide L.P. with physical copies of any and all documentation used in the analysis, as required by law, so that Plaintiffs could independently conduct their own comparative parity analysis and appropriately plead their case.

60. In the appeal, L.P. provided a detailed description of C.P.'s mental health and medical history, along with supporting documents, to show that the treatment C.P. received at Crossroads was medically necessary.

61. In the appeal, L.P. provided a description of a CALOCUS-CASII analysis to show that C.P. automatically qualified for residential treatment services.

62. In a letter dated April 15, 2025, IMS reported that Plaintiffs' level one appeal request had been denied.

63. In this denial letter, IMS stated:

> The review of the information provided has been completed. The Healthcare Plan's benefit coverage was independently audited to ensure compliance with the final MHPAEA (Mental Health Parity) rule. The findings were presented to the Healthcare Plan's team of attorneys to evaluate and incorporate any required changes into the 2025 Plan Summary. The excerpts below are from the Final 2025 NCDS Healthcare Plan Summary.
>
> We recognize the importance and value of the information provided. Based upon this information the original benefit denial determination is supported.

11

64. The denial letter continued by stating that "Crossroads Academy does not meet the Healthcare Plan's definition of a residential treatment facility as defined on pages 69 and 70 of the Plan Summary."

65. The denial letter then quoted the definition of "Residential Treatment Facility" from the Plan without any further discussion or description of which conditions IMS contended Crossroads failed to meet and attached copies of pages 69 and 70 of the Benefit Booklet.

66. The denial letter did not respond in any way to the arguments and evidence in L.P.'s level one member appeal that the treatment that C.P. received at Crossroads was medically necessary.

67. The denial letter did not respond in any way to the arguments and evidence in L.P.'s level one member appeal that the treatment that C.P. received at Crossroads was covered, even though it was provided out-of-network.

68. In a letter dated May 2, 2025, L.P. submitted a level two member appeal review of the services provided by Crossroads.

69. In the level two appeal, L.P. noted that IMS provided the same information in its denial letter that it had previously provided and failed to respond to arguments L.P. made in the level one appeal that Crossroads satisfied all of the criteria for a Residential Treatment Facility.

70. In the level two appeal, L.P. pointed out that the reviewer did not state how they contend Crossroads did not meet the requirements for a Residential Treatment Facility and that this lack of meaningful dialogue is a violation of ERISA because it did not explain the grounds for the denial or enable L.P. to refute those reasons.

71. In the level two appeal, L.P. provided additional information and argument supporting his contention that Crossroads satisfied the Plan's criteria to be a Residential Treatment Facility as that term is defined by the Plan.

72. In the level two appeal L.P. again noted that ERISA requires that all reviewers assigned to a case be appropriately qualified to review it and that their identities be disclosed, but IMS's denial letter provided no information about the person(s) who reviewed the appeal or their qualifications.

73. In the level two appeal, L.P. again asked to have the appeal reviewed by a board certified clinician who works in this industry and is trained to treat adolescents with the mental illnesses and substance abuse disorders with which C.P. was diagnosed.

74. In the level two appeal, L.P. noted that IMS failed to comply with his prior request to perform a MHPAEA parity analysis and to provide him with copies of the analysis and all documents relating to the decision, and instead IMS claimed that it passed this information along to its attorneys who will review it for upcoming policy changes.

75. In the level two appeal, L.P. again asked that IMS's review of the appeal include conducting a comparative parity analysis to determine whether or not the Plan was truly being administered in compliance with the MHPAEA, and to provide physical copies of any and all documents used, and additional information so that Plaintiffs could independently conduct their own parity analysis and appropriately plead their case.

76. In the level two appeal, L.P. again argued that C.P.'s medical history clearly established that he met Medical Necessity criteria for services in a Residential Treatment Facility.

77. IMS responded to Plaintiffs' request for a second level appeal via letter dated May 22, 2025, denying Plaintiffs' appeal request.

78. The denial letter cited the Plan's definition of a Residential Treatment Facility with the following argument:

> It is our position that Crossroads Academy clearly does not meet the definition of a "Residential Treatment Facility" under the plain language of the Plan (p. 69 and 70 of the Plan Summary, previously provided). Of particular concern are its staffing deficiencies, which are included in the definition of "Residential Treatment Facility" in strict conformance with the MPHAEA (Mental Health Parity). Its comparable medical/surgical benefit, i.e. a "Skilled Nursing Facility," includes physician care and 24/7 onsite nursing care by most state's licensing requirements.

79. As set forth above, Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

80. The denial by IMS/the Plan of benefits solely and directly caused Plaintiffs to incur no less than $144,481 for C.P.'s treatment at Crossroads.

81. After receiving the denials, litigation was Plaintiffs' only option to enforce their right to benefits owing under the Plan and seek reimbursement of expenses under the terms of the Plan (as written or as reformed or required by MHPAEA), and/or under the MHPAEA amendments to ERISA.

82. Plaintiffs thereafter retained the undersigned to pursue their rights and remedies under ERISA.

83. The remedies Plaintiffs seek herein are for the benefits due and pursuant to 29 U.S.C. § 1132(a)(1)(B), and, in the alternative, for appropriate equitable relief under 29 U.S.C. § 1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008, pre-judgment interest, recoverable fees under 29 U.S.C. § 1132(g), as well as an award of costs and expenses under 29 U.S.C. § 1132(g) and other applicable law.

84. Plaintiffs do not seek double recovery.

**FIRST CAUSE OF ACTION**

**(Claim for Recovery of Benefits Under 29 U.S.C. § 1132(a)(1)(B))**

85. All allegations of this Complaint are incorporated here as though fully set forth herein.

86. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as IMS acting as agent of the Plan, to "discharge [its] duties in respect to claims processing solely in the interests of the participants and beneficiaries" of the Plan. 29 U.S.C. § 1104(a)(1).

87. IMS and the Plan wrongly excluded coverage for C.P.'s treatment in violation of the terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health disorders.

88. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with Plaintiffs in the pre-litigation appeal process.

89. IMS/the Plan breached their fiduciary duties to Plaintiffs when they failed to comply with their obligations under 29 U.S.C. § 1104 and 29 U.S.C. § 1133 to act solely in C.P.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of C.P.'s claims.

90. The actions of IMS and the Plan in denying payment for C.P.'s treatment are a violation of the terms of the Plan, as written and/or as reformed as required or permitted under ERISA.

## SECOND CAUSE OF ACTION

### (Violation of the Mental Health Parity and Addiction Equity Act (29 U.S.C. § 1132(a)(3))

91. All allegations of this Complaint are incorporated here as though fully set forth herein.

92. The MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and the MHPAEA. The obligation to comply with both ERISA and the MHPAEA is part of IMS/the Plan's fiduciary duties.

93. Generally speaking, the MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

94. The MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical/surgical benefits and makes illegal separate treatment limitations that are applicable only to mental health or substance use disorder benefits. 29 U.S.C. § 1185a(a)(3)(A)(ii).

95. Impermissible nonquantitative treatment limitations (NQTLs) under the MHPAEA include, but are not limited to, restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. § 2590.712(c)(4)(ii).

96. Defendants are in violation of 29 C.F.R. § 2590.712(c)(4)(i) because the terms of the Plan, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with,

16

and more stringently applied to, the processes, strategies, standards, or other factors used to limit coverage for medical/surgical treatment in the same classification.

97. Plaintiffs expressly requested IMS to perform a MHPAEA analysis of the Plan. They expressed serious concern that IMS was violating the statute and asked for a response using specific and direct examples and to provide physical copies of all documents used. IMS failed or declined to do this.

98. These MHPAEA violations by Defendants are breaches of fiduciary duty and give Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. § 1132(a)(3) including, but not limited to:

(a) A declaration that the actions of Defendants violate the MHPAEA;

(b) An injunction ordering Defendants to cease violating the MHPAEA and requiring compliance with the statute;

(c) An Order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by Defendants to interpret and apply the terms of the Plan to ensure compliance with the MHPAEA;

(d) An Order requiring disgorgement of funds obtained or retained by Defendants as a result of their violations of the MHPAEA;

(e) An Order requiring an accounting by Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of Defendants' violations of the MHPAEA;

(f) An Order based on the equitable remedy of surcharge requiring Defendants to provide payment to Plaintiffs as make-whole relief for their loss;

17

(g) An Order equitably estopping Defendants from denying Plaintiffs' claims in violation of the MHPAEA; and

(h) An Order providing restitution from Defendants to Plaintiffs for their loss arising out of Defendants' violations of the MHPAEA and unjust enrichment.

99. In addition, Plaintiffs are entitled to an award of pre-judgment interest and attorney fees and costs pursuant to 29 U.S.C. § 1132(g).

WHEREFORE, Plaintiffs seek relief as follows:

1. Judgment in the total amount paid for C.P.'s treatment at Crossroads;

2. Pre- and post-judgment interest to the date of payment;

3. In the alternative, appropriate equitable relief under 29 U.S.C. § 1132(a)(3) as outlined under Plaintiffs' Second Cause of Action;

4. Recoverable fees and costs incurred pursuant to 29 U.S.C. § 1132(g); and

5. For such further relief as the Court deems just and proper.

DATED this 13th day of April, 2026.

s/Norris A. Adams, II
NORRIS A. ADAMS, II
N.C. State Bar No. 32552
**ESSEX RICHARDS, P.A.**
1701 South Boulevard
Charlotte, North Carolina 28203
Telephone: (704) 377-4300
Facsimile: (704) 372-1357
NAdams@essexrichards.com

John M. Mejia*
Utah State Bar No. 13965
**CHRISTENSEN & JENSEN, P.C.**
257 East 200 South, Suite 1100
Salt Lake City, Utah 84111

Telephone: (801) 323-5000
Facsimile: (801) 355-3472
John.mejia@cjlaw.com

*Attorneys for Plaintiffs*

*Subject to Admission Pro Hac Vice